IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AITMUS R., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, Commissioner of Social Security,[1] <br><br> Defendant. | No. 18 C 5735 <br><br> Magistrate Judge Gabriel A. Fuentes |

## MEMORANDUM OPINION AND ORDER[2]

On May 29, 2012, the claimant, Aitmus R. ("Plaintiff"),[3] filed applications for supplemental security income ("SSI") and Disability Insurance Income ("DIB"), alleging that he became disabled on December 31, 2008. (R. 294-301.) Plaintiff initially pursued his claims *pro se*, and after a hearing on September 16, 2014 (R. 79-114), the Administrative Law Judge ("ALJ")

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 1, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 31.)

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name, thereby suppressing his last name, in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants are not anonymous litigants in that their names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

issued an opinion on June 19, 2015 denying his claims (R. 119-39). On October 13, 2016, the Appeals Council remanded Plaintiff's case back to the ALJ to obtain additional evidence on Plaintiff's impairments and to further consider Plaintiff's maximum residual functional capacity ("RFC"). (R. 140-42.) On remand, Plaintiff submitted additional evidence and received a second hearing before the ALJ, this time represented by counsel. (R. 44-78.) On July 19, 2017, the ALJ issued a partially favorable decision: he found that Plaintiff could perform a limited range of sedentary work and thus was not disabled since his alleged onset date, but that on May 30, 2017, on his 50th birthday, Plaintiff became disabled. (R. 15-43.) On July 5, 2018, the Appeals Council denied Plaintiff's request for review of the ALJ's July 2017 decision (R. 1), making it the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

On January 8, 2019, Plaintiff, represented by counsel, filed a motion seeking reversal or remand of the Commissioner's decision denying her applications for benefits. (D.E. 17.) The Commissioner has filed a cross-motion for summary judgment asking the Court to affirm the decision. (D.E. 25.) For the following reasons, the Court grants Plaintiff's motion for remand and denies the Commissioner's motion to affirm.

## I. The Record

Plaintiff begins his review of the evidence on April 21, 2009, when he presented to the emergency room ("ER") with complaints of headache and chest pain. (D.E. 18: Pl.'s Mem. at 1, citing R. 588.).[4] Plaintiff was discharged the next day with diagnoses of atypical chest pain (ruled out heart attack), hypertensive urgency, morbid obesity, polysubstance abuse and obstructive sleep apnea. (R. 588.) The physician noted Plaintiff's headache was likely secondary to uncontrolled

---

[4]Plaintiff's date last insured was March 31, 2009. To be entitled to DIB, Plaintiff must establish he was under a disability on or before this date. *See Britt v. Berryhill*, 889 F.3d 422, 425 (7th Cir. 2018). As Plaintiff's review of the evidence begins after this date, Plaintiff does not appear to contest the ALJ's finding that he did not establish disability prior to March 31, 2009. (R. 36.) The question of Plaintiff's entitlement to SSI is not limited by this date.

hypertension (high blood pressure) as Plaintiff had been "fairly noncompliant" in taking his medications. (*Id.*) The physician also noted that Plaintiff was noncompliant with wearing his CPAP (continuous positive airway pressure) machine for his sleep apnea.[5] (*Id.*)

Between 2009 and 2012, Plaintiff received medical care while he was incarcerated in Indiana on drug-related crimes. He took medication for hypertension and high cholesterol, and he was granted a request for a bottom bunk. (*See* R. 707, 755.) He made repeated requests for stronger pain medication -- such as Tylenol # 3 (Tylenol with Codeine) and Neurontin (for nerve pain) -- for pain in his knees, legs, feet, hands, neck and back (R. 676-731), which he received until he was "cut off" because he was "caught hoarding medication" in January 2010 (R. 661, 752-54, 759-60, 770.) Plaintiff had occasional chest pain and shortness of breath, and a chest x-ray in March 2010 showed evidence of pulmonary hypertension[6] and edema (swelling caused by excess fluid). (R. 1163-68, 1178.) In 2010 and 2011, several medical notes indicated Plaintiff had difficulty ambulating due to knee problems or shortness of breath. (R. 891-96, 1164, 1172-75.) In February 2012, Plaintiff weighed 415 pounds and had a body mass index ("BMI") of 54.75. (R. 867-70.)

On August 3, 2012, Teofilo Bautista, M.D., conducted a state agency consultative examination. (R. 991.) He noted that Plaintiff walked with a cane and limped. (R. 992.) Plaintiff refused range-of-motion testing on his back and refused to walk without a cane due to pain. (R. 992-93.) Plaintiff's range of motion in his knees, feet, wrists, neck and left shoulder was limited due to pain, and he had swelling in both ankles and feet and numbness in his fingertips and toes.

---

[5] Sleep apnea is a "serious sleep disorder in which breathing repeatedly stops and starts." https://www.mayoclinic.org/diseases-conditions/sleep-apnea/symptoms-causes/syc-20377631. CPAP machines deliver air pressure to a mask to keep upper airway passages open, preventing snoring and sleep apnea. https://www.mayoclinic.org/diseases-conditions/sleep-apnea/multimedia/continuous-positive-airway-pressure-cpap/img-20007977.

[6] "Pulmonary hypertension is a type of high blood pressure that affects the arteries in your lungs and the right side of your heart." https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697.

3

(*Id.*) Further, he could not button or zip with his left hand and had bilateral wheezing in his lungs. (*Id.*) An x-ray on August 21, 2012, showed mild degenerative changes in Plaintiff's knees. (R. 1001.) On August 22, 2012, a state agency consultant issued a physical RFC opinion finding Plaintiff could perform light work with environmental and postural limitations. (R. 1008-12.) This opinion was affirmed on reconsideration. (R. 1039.)

On August 6, 2012, Roger Parks, Psy.D., performed a state agency consultative psychological examination. (R. 995.) Plaintiff reported having suicidal thoughts and hearing voices commanding him to harm himself or others. (R. 996.) Plaintiff stated that he lived with his uncle, who did all the chores. (R. 997.) Dr. Parks found Plaintiff's mood was depressed, his affect was very constricted and he had difficulty concentrating. (R. 996-97.) He diagnosed Plaintiff with major depressive disorder with psychotic features and a Global Assessment of Functioning ("GAF") score of 50.[7] (*Id.*) On August 28, 2012, a state agency consultant issued a mental RFC opinion finding Plaintiff had moderate restriction in activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (R. 1026.) The opinion found Plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions, but that he could "understand, remember and carry out unskilled and semi-skilled tasks[,] . . . attend to task for sufficient periods of time to complete tasks [and] . . . manage the stress involved with such work." (R. 1030-32.) This opinion was affirmed on reconsideration (R. 1040.)

---

[7]The GAF measures an individual's psychological, social, and occupational abilities. *Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018) (citing American Psych. Assoc., Diagn. & Stat. Man. of Mental Disorders 34 (4th Ed., Rev. 2000) (DSM-IV)). A score from 41 to 50 indicates an individual had serious difficulty in overall functioning, and a score from 51 to 60 indicates moderate difficulty. *Id.* "The DSM-V, the latest version of the Diagnostic and Statistical Manual of Mental Disorders, has abandoned the GAF. But the Social Security Administration still instructs ALJs to treat GAF scores as medical-opinion evidence." *Gerstner*, 879 F.3d at 263 n.1 (citing American Psych. Assoc., Diagn. & Stat. Man. of Mental Disorders 16 (5th Ed., 2013) (DSM-V)).

On February 11, 2013, Plaintiff was admitted to the ER with complaints of chest pain and dizziness. (R. 1318-19.) A chest x-ray revealed his heart was moderately enlarged but testing showed myocardial injury was unlikely. (R. 1340, 1347, 1352.) Plaintiff was discharged on February 13, 2013 with a diagnosis of atypical chest pain but readmitted the same day due to suicidal thoughts. (R. 1257.) He was assessed an initial GAF score of 45-50, but he showed improvement with medication and therapy and was discharged on February 15, 2013 with a diagnosis of major depressive disorder in partial remission. (R. 1575.)

In October 2013, Plaintiff was hypertensive when he went to the ER complaining of chest pain; his EKG was normal except for some atrial enlargement. (R. 1049-55.) Plaintiff reported not having his hypertension medication for more than a year and taking his mother's medication. (R. 1055-56.) He had swelling in his lower extremities but normal range of motion. (R. 1056.) Plaintiff was discharged the same day in good condition: his blood pressure had improved and he was ambulating without assistance with a steady gait. (R. 1050.)

On January 8, 2014, Plaintiff was admitted to the hospital after claiming to have had a stroke two days prior with left-sided weakness and facial numbness. (R. 1064, 1069.) Testing for a stroke was negative; however, Plaintiff reported having a "history" of strokes.[8] (R. 1064-67.) Plaintiff also complained of chest pain and foot pain, and he used a wheelchair and ambulated only very short distances with a cane. (R. 1064-66.) He had been noncompliant with his medications, and his blood pressure was "out of control." (R. 1067, 1069.) Upon examination, his physician found that Plaintiff's reliability was poor and that he put forth very little effort. (R. 1064, 1071.) On January 10, 2014, the physician concluded that Plaintiff was at "baseline function" and did not need inpatient rehabilitation. (R. 1065.)

---

[8] Plaintiff also reported having a history of strokes and heart attacks in 2010 (*see* R. 1183) and in 2012 (*see* R. 995.)

5

On April 29 and 30, 2014, Plaintiff had intake examinations at the Indiana Department of Corrections after he was again incarcerated for drug-related crimes. He reported having a seizure the prior week, and regularly hearing his sister's voice telling him to hurt himself or others. (R. 1124-31). He was given a GAF score of 60. (R. 1129.)

On June 22, 2014, Plaintiff was taken to the ER reporting left-side paralysis and left-eye blindness for the previous few days. (R. 1221.) The physician noted he had "some mild left facial droop" and weakness, his left pupil was unresponsive to light, and he had decreased strength in his left lower and upper extremity. (R. 1224-25.) However, an extensive workup was negative for an acute or old CVA (cerebrovascular accident or stroke).[9] (R. 1226.) Plaintiff reported having had two prior strokes, but the doctor did not see evidence of this in the medical history and noted Plaintiff "really was not consistent with his information at all and story was changing." (R. 1229.) The doctor also questioned whether Plaintiff put full effort into testing his upper and lower extremity strength. (R. 1230-31.) Plaintiff was discharged on June 23, 2014. (R. 1227.)

Plaintiff was still in jail when he appeared telephonically and *pro se* at his first hearing before an ALJ on September 16, 2014. (R. 81, 83.) He testified that he could stand only two to three minutes before needing to sit due to back pain and shortness of breath, and he could only sit about 20 to 30 minutes before he had to lay down due to pain. (R. 92-93.) In addition, he sleeps sitting up because of his sleep apnea. (R. 101-02.) Plaintiff also testified that he was blind in his left eye, had no feeling in his fingers and toes and had suffered several strokes. (R. 93-95.)

On October 9, 2015, Plaintiff sought treatment after falling and hurting his left shoulder. (R. 1463.) He reported having several falls since leaving jail two months before. (*Id.*) On October 17, 2015, Plaintiff was back in the ER after falling twice when his knee gave out. (R. 1558.) In

---

[9]CVA is a loss of blood flow to part of the brain, which damages brain tissue. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cva (last visited Sept. 17, 2019).

addition to pain in his knees, right ankle, left shoulder and head, Plaintiff reported numbness in his hands and feet. (*Id.*) A CT scan of his cervical spine (neck) revealed "severe central spinal canal narrowing with spinal cord compression at C3-C4 level" and "multilevel degenerative changes with diffuse disc bulge." (R. 1561.) Later that month, Plaintiff underwent cervical spine fusion surgery. (R. 1503.) There are no hospital reports from the surgery in the record; however, the record shows that Plaintiff received post-surgery inpatient treatment from HCR Manor Care from October 30 through December 10, 2015. (R. 1484-85, 1504-40.)

From January 2016 through February 2017, Plaintiff saw Mithila Janakiram, M.D., approximately once a month to receive treatment and medication for diabetes, hypertension, hyperlipidemia, depression and coronary arteriosclerosis (hardening of the heart arteries) (R. 1264-99.) Although the medical reports generally indicated that Plaintiff was ambulating normally, in June 2016, Dr. Janakiram noted Plaintiff had chronic back pain and used a cane (R. 1282-83), and in October 2016, Plaintiff was in "acute distress," wheezing and short of breath, and ambulating with a walker. (R. 1270-76.) In December 2016, Plaintiff was again having difficulty breathing, and he had an episode of atrial flutter (an arrhythmia, or heart rhythm disorder). (R. 1268-71.)

On January 10, 2017, Plaintiff went to the ER complaining of severe shortness of breath and sharp chest pain; an EKG showed atrial flutter and a chest x-ray showed moderate pulmonary vascular congestion (accumulation of fluid in lungs), but he does not appear to have been admitted. (R. 1563-69.) However, on January 17, 2017, Plaintiff returned to the hospital via ambulance with shortness of breath, acute pulmonary edema (excess fluid in lungs) and atrial flutter with rapid ventricular rate. (R. 1410, 1421.) On admission, Plaintiff was diagnosed with heart failure and respiratory failure secondary to chronic obstructive pulmonary disease (R. 1419.) He was discharged on January 28, 2017, with additional diagnoses of left atrial and left ventricular

thrombus (blood clot), seizure disorder (he had an acute seizure while in the hospital), Type 2 diabetes mellitus, atrial flutter, obesity hypoventilation syndrome,[10] obstructive sleep apnea and dyslipidemia (abnormal amount of lipids in the blood). (R. 1419-20.) The physician also noted Plaintiff had an overall problem with compliance with medications. (R. 1414, 1419.)

At a follow-up visit in February 2017, Dr. Janakiram noted Plaintiff could not "walk really well" and continued to have shortness of breath. (R. 1267-68.) In March 2017, he had weakness and increased fatigue with standing as well as decreased mobility and increased pain. (R. 1481.)

The record contains one report from social worker Latasha R. Reggans, MSW, dated March 21, 2017. She noted Plaintiff used a cane or wheelchair to walk, and he reported "ceasing medication because of suicide ideation related to multiple stressors. . . ." (R. 1482.)

## II. Evidentiary Hearing

On March 22, 2017, Plaintiff appeared with counsel at his second hearing before the ALJ. (R. 47.) Plaintiff testified that he became short of breath after walking 10 to 15 steps. (R. 54.) He brought a walker to the hearing, which he said he had used since his last surgery. (R. 54-55, 67-68.) Plaintiff stated that he did not do any work around the house; he had a home health care aide or personal assistant who shops and drives for him and helps him dress. (R. 57-59.) Plaintiff described having pain in his back, his knees, his neck and his left hand. (R. 58-64.) The pain did not go away when he was sitting; pain medication helped but made him sleepy. (*Id.*) Plaintiff also testified that he woke up every 15 to 20 minutes due to sleep apnea and took about six naps per day. (R. 55-56.) He stated that he lost his CPAP machine because he could not pay for storage. (R. 61.) Plaintiff also testified that he sees a counselor regularly for depression. (R. 64.)

---

[10]A "condition in some obese people in which poor breathing leads to lower oxygen and higher carbon dioxide levels in the blood." https://medlineplus.gov/ency/article/000085.htm.

The ALJ presented the vocational expert ("VE") with a hypothetical individual who could perform sedentary work with additional environmental and manipulative limitations, as well as a limitations to "simple/routine tasks, jobs that involve only simple decision-making, no multitasking, . . . only occasional or minor changes in the work setting, . . . [and] require no more than simple judgment." (R. 72.) The VE testified that there were jobs available for such an individual, but not for an individual who had to nap 15 to 20 minutes six times a day. (R. 72-75.)

### III. ALJ's Decision

On July 19, 2017, the ALJ issued a written opinion finding Plaintiff was not disabled prior to May 30, 2017, but that he became disabled on that date. (R. 36.) At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of December 31, 2008. (R. 21.) At Step Two, the ALJ found Plaintiff had the following severe impairments: depression, obesity, hypertension, sleep apnea, and degenerative joint disease. (*Id.*) The ALJ considered Plaintiff's allegations of "residuals of a stroke, including blindness and hallucinations," but determined that no objective findings supported those allegations. (R. 22.) In addition, the ALJ found that Plaintiff's diabetes was not severe because he was not insulin-dependent and did not have work-related limitations from diabetes. (*Id.*)

At Step Three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. (R. 22.) Despite a history of uncontrolled hypertension, the ALJ found that Plaintiff was noncompliant with treatment and did not meet the criteria of a listing for cardiovascular disease. (*Id.*) In addition, the ALJ determined that Plaintiff did not meet the criteria of any listing for musculoskeletal impairments because "[w]hile the claimant has difficulty ambulating, he is able to ambulate effectively with the assistance of a cane" and "[o]n many occasions . . . was able to ambulate normally and effectively without an assistive device." (*Id.*) In

9

addition, x-rays revealed only mild degenerative arthritis in his knees. (*Id.*) The ALJ found Plaintiff's obesity did not "significantly impact" or "greatly increase the severity or functional limitations" from his cardiac, musculoskeletal, or respiratory problems. (R. 23.)

Regarding mental functioning, the ALJ found Plaintiff had moderate limitations in understanding, remembering or applying information; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 23.) The ALJ noted that the August 2012 state agency psychological examination and mental RFC opinion found minimal limitations and Plaintiff had a GAF score of 60 at a psychiatric examination on April 30, 2014. (*Id.*) The ALJ recognized Plaintiff's psychiatric hospitalization in February 2013, but found that there were only minimal findings and no evidence of follow-up treatment (*Id.*) The ALJ also found that "[t]reatment records revealed no significant limitations on mental status examinations." (*Id.*) Nevertheless, the ALJ stated that he gave Plaintiff "the benefit of the doubt and concluded significant limitations in reducing the claimant to simple unskilled work," even though "not supported in the record." (*Id.*)

The ALJ assigned Plaintiff a sedentary RFC due to his obesity and cardiac impairments. (R. 32.) He found Plaintiff could sit an unlimited amount in an eight-hour workday, but only stand or walk 10 minutes at a time and no more than two hours total. (R. 24.) The ALJ stated that "[w]hile the claimant is able to ambulate effectively[,] . . . [h]e should be allowed to use a cane at all times while walking." (*Id.*) The ALJ also limited Plaintiff to frequent fine manipulation with his left hand, non-hazardous environments and no concentrated exposure to pulmonary irritants. (*Id.*) The ALJ found Plaintiff was "incapable of work requiring complex written or verbal communication" and limited him to "simple, routine and repetitive tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment." (*Id.*)

The ALJ found "significant . . . inconsistencies in the record" and determined that "many of [Plaintiff's] allegations lacked support in the medical records." (R. 25, 33.) First, the ALJ found that Plaintiff's allegation that he had a history of multiple heart attacks and strokes was not supported in the record on examination or in objective testing. (R. 25, 27-28, 33.) The ALJ noted that in both the January 2014 and June 2014 ER visits, testing was negative for stroke. (R. 28.) In addition, the ALJ noted that the doctor believed Plaintiff did not put in much of an effort on examination, which "mitigates against acceptance of his overall allegations." (R. 29.)

Second, the ALJ found that treatment records were inconsistent with Plaintiff's allegation that he needed or was prescribed a cane, walker or wheelchair to ambulate. (R. 25-26, 33.) The ALJ noted that an October 2013 medical report documented Plaintiff ambulating without assistance. (R. 28.) The ALJ acknowledged that Plaintiff was hospitalized in October 2015 after allegedly falling at home and that x-rays showed "severe" central spinal canal narrowing; however, the ALJ "reject[ed]" the medical opinion that Plaintiff needed a walker or a wheelchair. (R. 28, 30.) In addition, the ALJ found treatment records throughout 2016 and in February 2017 showed "minimal objective findings" and normal ambulation and gait, except for a note in October 2016 stating that Plaintiff used a walker. (R. 31, 33.) The ALJ found these records were "grossly inconsistent with the presentation at the hearing," where the ALJ observed Plaintiff "moved very slowly with a walker." (*Id.*) However, the ALJ stated that he gave Plaintiff the "benefit of the doubt" by providing for a cane while ambulating in the RFC. (R. 28.)

Third, the ALJ determined that medical records while Plaintiff was incarcerated "do not document that the claimant received medical care as would be expected of a disabled individual" because despite multiple medical complaints, "[t]he only accommodation noted was that claimant be assigned a bottom bunk" and be given an ankle brace and insoles. (R. 27.) The ALJ concluded

that "[i]f the claimant were as impaired as alleged, [he] would expect to see more record of such conditions during incarceration." (*Id.*)

Fourth, the ALJ determined that Plaintiff's noncompliance with his hypertensive medication and CPAP treatment for his sleep apnea showed these conditions were not as limiting as he alleged. (R. 28, 33.) The ALJ specifically noted a medical report from January 2014 calling out Plaintiff's noncompliance and lack of cooperation with testing. He found Plaintiff did not establish that he was unable to obtain treatment and medication when needed. (R. 26-27.)

Fifth, the ALJ rejected Plaintiff's claim that he suffered from fatigue and needed multiple naps a day. (R. 33-34.) The ALJ found these allegations were not supported by any medical assessment, and that "the medical record specifically noted no complaints of fatigue on multiple occasions" in 2016 (R. 31, 33-34.)

Sixth, the ALJ found that Plaintiff was not as severely limited by mental impairments as he alleged. The ALJ found that during his February 2013 hospitalization, his treatment "appeared to be fairly minimal as there were no significant findings and the claimant was stable" and "there was no indication of any continuing problem." (R. 30.) The ALJ decided Plaintiff's reduced GAF score during his hospitalization did not describe his functioning over time and his GAF score of 60 at another time did not suggest work-preclusive limitations. (R. 28-30.) The ALJ found "no support or corroboration in the medical record" for the diagnoses in Ms. Reggan's March 2017 report and no evidence Plaintiff received any additional mental health treatment. (R. 26, 31-33.)

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work, but that at Step Five, prior to May 30, 2017, Plaintiff could perform sedentary work and thus was not disabled. (R. 34-35.) The ALJ determined that Plaintiff became disabled and entitled to SSI[11]

---

[11] Plaintiff was only entitled to SSI at that point because his date last insured -- the latest he could prove disability to be entitled to DIB -- was March 31, 2009. (R. 34-36.)

12

on May 30, 2017, when he turned 50 and became "an individual closely approaching advanced age."[12] (R. 35-36.)

## IV. Analysis

Plaintiff argues that the ALJ's opinion should be reversed and remanded for failing to properly assess his subjective allegations, improperly evaluating his RFC and failing to adequately account for his moderate difficulties with concentration persistence or pace. The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal citations and quotations omitted). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). The Court finds that remand is required for the reasons below and declines to reach Plaintiff's additional arguments for remand.[13]

---

[12] Under the Social Security Regulations, if a person is closely approaching advanced age (age 50-54), the Commissioner "will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 416.968(d)(4).

[13] The Court addresses one of Plaintiff's arguments that counsel has continued to raise despite repeated rejection by this Court: Plaintiff's argument that the ALJ's use of the phrase "not entirely consistent with the medical record" in describing Plaintiff's allegations improperly increased Plaintiff's evidentiary burden. (Pl.'s Mem. at 6-7.) "[T]his statement has nothing to do with the preponderance of the evidence standard. Instead, it merely reflects another ALJ's use of language that the Seventh Circuit has repeatedly described as meaningless boilerplate because it yields no clue to what weight the ALJ gave the testimony." *Phillips v. Berryhill*, No. 17 C 4509, 2018 WL 4404665, at *6 (N.D. Ill. Sept. 17, 2018) (internal quotations and citations omitted). "The fact that the ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). Courts in this district have repeatedly rejected the argument that this boilerplate language changes the claimant's evidentiary burden. *See, e.g., Michelle G. v. Berryhill*, No. 18 C 408, 2019 WL 2368618, at *7 (N.D. Ill. June 3, 2019); *Randall M. v. Berryhill*, No. 18 C 2101, 2019 WL 2473829, at *6 (N.D. Ill. June 13, 2019); *Stephen M. v. Berryhill*, No. 17 C 7608, 2019 WL 2225986, at *9 (N.D. Ill. May 23, 2019); *Tracie B. v. Berryhill*, No. 17 C 7276, 2019 WL 1239685, at *6 (N.D. Ill. Mar. 18, 2019).

### A. "Minimal Objective Findings"

Plaintiff contends that the ALJ wrongly discredited his allegations about the severity of his pain and related functional limitations on the grounds that the record "contained minimal objective findings." (Pl.'s Mem. at 8.) The Court will overturn an ALJ's adverse credibility determination "only if it is unsupported by substantial evidence or rests on legally improper analysis." *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018).

In *Lambert*, the Seventh Circuit held that the ALJ's adverse credibility determination was not supported by substantial evidence where the ALJ "misinterpret[ed] the medical records" and "overlooked" or "glossed over" important evidence that supported the claimant's alleged limitations. *Lambert*, 896 F.3d at 777-78. In that case, the ALJ had relied on examinations that revealed "normal" findings and no strength or motor deficits. However, the court of appeals held that those findings did not undermine the claimant's reports of pain and functional limitations where despite normal findings, his physicians continued to treat his pain through a variety of methods. *Id.* Likewise, in *Gerstner v. Berryhill*, the Seventh Circuit held that remand was necessary where the ALJ had relied on a physician's report showing "normal" findings in determining that the claimant was not disabled. 879 F.3d 257, 262 (7th Cir. 2018). The Seventh Circuit found that the ALJ had overlooked or ignored evidence that despite some normal findings, the physician's diagnoses of the claimant remained unchanged, undermining the ALJ's conclusion that the claimant's mental health had improved. *Id.*

Similarly, in this case, the ALJ stressed that doctors' notes often recorded that Plaintiff had "normal" ambulation and gait and did not need an assistive device. However, the ALJ overlooked or glossed over the evidence that during some of the periods when such normal findings were noted, Plaintiff was also recorded having difficulty with mobility even with an assistive device.

Even more importantly, although the ALJ recognized that a CT scan showed Plaintiff had "severe" spinal canal narrowing and spinal cord compression, the ALJ overlooked or did not understand that Plaintiff had spinal surgery soon after this CT scan, and that after surgery, Plaintiff received weeks of inpatient treatment and needed assistance with ambulation.

The Court is not dismissing the ALJ's concern that Plaintiff at times exaggerated the diminished strength and range of motion in his extremities due to pain. However, we remand in view of the ALJ's failure to address important evidence that undermines his various conclusions that the record contained "minimal" objective findings. *See also Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (holding that remand was necessary where the ALJ's determination that the claimant's impairments were not as limiting as he alleged was based on erroneous evaluation of the claimant's symptoms, misinterpretation of the medical evidence, and mischaracterization of a doctor's report); *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (holding that remand was necessary where the ALJ misconstrued evidence from a physician's assessment and thus failed to "engag[e] with the evidence that weigh[ed] against [his] findings").

### B. Heart and Respiratory Failure

Plaintiff also contends that the ALJ failed to adequately account for his asthma and congestive heart failure, including symptoms like chest pain, shortness of breath, asthma and fatigue. (Pl.'s Mem. at 9-10.) The Court agrees.

Like the notes from 2016 noting "normal" ambulation, the ALJ stressed that the reports from 2016 indicated no complaints of fatigue. However, the ALJ overlooked the reports during that same year that showed Plaintiff came in wheezing and in acute distress. In fact, these reports culminated in January 2017 when Plaintiff went into heart and respiratory failure and had to be hospitalized for days. Not surprisingly, he still had shortness of breath, weakness and fatigue at his

follow-up checkups in February and March 2017, and the ALJ observed that Plaintiff moved very slowly with a walker at the hearing. In addition, Plaintiff needed a home health aide to help him with household chores during this time. Despite this evidence to the contrary, the ALJ found that Plaintiff's presentation at the hearing was inconsistent with normal findings in 2016.

The ALJ's failure to address evidence that Plaintiff had serious limitations from chest pain, shortness of breath and fatigue, at least from January 2017, requires remand. *See Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018) (holding that the ALJ's focus on evidence from before the claimant moved in with his mother because it became too hard for him to live alone "left unanswered the possibility of disability onset sometime thereafter").

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for remand (D.E. 17) and denies the Commissioner's motion to affirm (D.E. 25). This case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: October 4, 2019**